UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER WIROWEK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., et al.,<br><br>Defendants. | Case No. 24-cv-06795-VC  (KAW)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS**<br><br>Re: Dkt. No. 49 |

On November 26, 2025, Defendants Amazon.com, Inc., Amazon.com Services, LLC, and Amazon.com LLC filed the instant motion to retain confidentiality designations of 66 documents produced by Defendants to Plaintiff Christopher Wirowek.  (Defs.' Mot. re Confidentiality, Dkt. No. 49.)[1]  Having considered the parties' filings, the relevant legal authorities, and the arguments made at the February 19, 2026 motion hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I.    BACKGROUND

Plaintiff filed the instant case against Defendants, alleging that he was injured while using a ladder that was purchased on Defendants' website ("subject ladder").  (Third Amend. Compl. ¶¶ 14-15, Dkt. No. 25.)

Plaintiff challenges the confidentiality designation of 66 out of 71 documents that Defendants have designated as "Confidential" under the Protective Order.  (Defs.' Mot. re Confidentiality at 2.)  The documents at issue fall under two categories:

**Standard Operating Procedures ("SOPs")**: 60 versions of SOPs regarding product

---

[1] On December 30, 2025, the motion was referred to the Court as a discovery motion.  (Dkt. No. 63.)

United States District Court
Northern District of California

safety and seller identity verification processes.  This includes 49 versions of PSC – Investigation Procedure (USA and Canada) and one version of PSC – Investigation Procedure (Global) (collectively, "Investigation Procedures"), which outline Defendants' internal policies and procedures regarding product safety investigations and provide instructions on how to investigate and handle reported product safety complaints.  (Jessica Chiang Decl. ¶ 7, Dkt. No. 49-1.)  These Investigation Procedures reflect Defendants' internal risk mitigation strategies, investigation framework and propriety tools, and escalation protocols and legal compliance mechanisms.  (Chiang Decl. ¶ 7.)  They also contain non-public procedures Defendants use to assess product safety complaints, including how to prioritize reports, when to escalate cases, and which internal teams are involved in that decision-making process.  (Chiang Decl. ¶ 7.)

The SOPs also include nine versions of PS Customer Feedback Monitoring Procedure Global ("Customer Feedback Monitoring Procedures").  These provide guidance on classifying customer reviews, such as a step-by-step process of how investigators use Defendants' proprietary software tools to check customer reviews for potential safety hazards.  (Chiang Decl. ¶ 8.)

Finally, the SOPs include one version of CN Seller Identity Verification SOP, which provides a step-by-step process on how to review documents provided by China, Hong Kong, and Taiwan-based sellers, how to confirm their validity, and how to determine whether to approve or deny the seller registration.  (Chiang Decl. ¶ 9.)  This SOP was developed to reduce the risk of fraudulent activity, such as the sale of counterfeit goods, identity theft, and scams targeting customers or other sellers.  (Chiang Decl. ¶ 9.)

**Internal Spreadsheets**:  The internal spreadsheets are six spreadsheets containing information about the subject ladder.  Two spreadsheets contain information about customer complaints and returns regarding the subject ladder, two spreadsheets contain information about customer reviews regarding the subject ladder, and two spreadsheets contain historical data recording every change to the product detail page for the subject ladder.  (Chiang Decl. ¶¶ 12-14.)  The data within the spreadsheets were generated using Defendants' proprietary software.  (Chiang Decl. ¶¶ 12-14.)

On November 26, 2025, Defendants filed the instant motion.  On December 10, 2025,

Plaintiff filed his opposition.  (Pl.'s Opp'n, Dkt. No. 51.)  On December 17, 2025, Defendants filed their reply.  (Defs.' Reply, Dkt. No. 54.)

On January 29, 2026, the Court ordered Defendants to provide the CN Seller Identity Verification SOP and one version of each internal spreadsheet for in camera review.  (Dkt. No. 72.)  The Court has received and reviewed these documents.

## II.    LEGAL STANDARD

Generally, "the public is permitted access to litigation documents and information produced during discovery." *In re Roman Catholic Archbishop*, 661 F.3d 417, 424 (9th Cir. 2011) (internal quotation omitted).  A court may, however, issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  If a party challenges whether documents have been properly designated as confidential, the party seeking to maintain confidentiality pursuant to a protective order "has the burden of establish that there is good cause to continue the protection of the discovery material." *In re Roman Catholic Archbishop*, 661 F.3d at 424.

When a party challenges the confidentiality of information under a protective order, the court conducts a two-step analysis.  "First, it must determine whether particularized harm will result from disclosure of information to the public." *In re Roman Catholic Archbishop*, 661 F.3d at 424 (internal quotation omitted).  "[B]road allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* (internal quotation omitted).  Rather, the party seeking to maintain confidentiality must "allege specific prejudice or harm." *Id.* (internal quotation omitted).  Thus, a party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003).

"Second, if the court concludes that such harm will result from disclosure of the discovery documents, then it must proceed to balance the public and private interests to decide whether maintaining a protective order is necessary." *In re Roman Catholic Archbishop*, 661 F.3d at 424. The court considers the following non-exhaustive factors:

United States District Court
Northern District of California

3

(1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public.

*Id.* at 424 n.5 (internal quotation omitted).

### III.   DISCUSSION

#### A.   Particularized Harm

First, the Court considers whether Defendants have demonstrated that particularized harm will result from public disclosure of the two categories of documents at issue.

##### i.   SOPs

The Court finds that Defendants have demonstrated that particularized harm will result from the public disclosure of the SOPs.  Courts in this Circuit have found that internal policies and procedures are confidential where their disclosure can create a competitive disadvantage or assist bad actors in avoiding detection.  For example, in *Avaya Inc. v. Pearce*, the district court found that a "Counterfeit Analysis" which "explains the significance of the different factors analyzed" was confidential, as disclosure would "provid[e] a roadmap to potential counterfeiters regarding how to evade Avaya's detection measures."  No. 19-cv-00565-SI, 2020 U.S. Dist. LEXIS 241116, at *5 (N.D. Cal. Dec. 22, 2020).  Similarly, in *In re Bank of America California Unemployment Benefits Litigation*, the district court found that there were compelling reasons to seal documents concerning fraud detection and prevention policies and strategies, as such processes could be used by bad actors to "circumvent those protections."  No. 21MD2992-GPC(MSB), 2024 WL 4820704, at *3-4 (S.D. Cal. Nov. 12, 2024); *see also Adtrader, Inc. v. Google LLC*, No. 17-cv-07082-BLF, 2020 U.S. Dist. LEXIS 207918, at *5-6 (N.D. Cal. Feb. 4, 2020) (finding internal policies and systems related to detecting invalid activity and processing payments were confidential).

Such is the case here.  Defendants explain that disclosure of the SOPs could allow competitors to "reverse-engineer Amazon's internal policies, procedures, and compliance structures; gain insight into how Amazon evaluates or prioritizes consumer complaints; and

undermine Amazon's ability to maintain a competitive advantage in the . . . areas of risk and safety management." (Chiang Decl. ¶ 11.)  Additionally, Defendants point to the ability of bad actors to use the SOPs to "exploit . . . any perceived gaps in safety procedures and to evade Amazon's product safety measures--for example, by circumventing Amazon's fraud detection measures or engaging in customer review abuse." (Chiang Decl. ¶ 11.)

In response, Plaintiff argues that safety policies and procedures "may not be confidential where[] 'much of the information is common sense safety procedures found in the policies of many companies.'" (Pl.'s Opp'n at 7 (quoting *Zambrano v. Ins. Auto Auctions Corp.*, No. 20-367, 2021 U.S. Dist. LEXIS 175838, at *4 (W.D. La. Sep. 15, 2021).)  Plaintiff contends that the Customer Feedback Monitoring Procedures are "essentially 'did the product hurt the customer?' along with data entry instructions," and that "[p]resumably, competing online marketplaces have already implemented such common sense safety procedures." (*Id.*)  It is unclear how the Court can "presume" that other companies have similar safety procedures without evidence.  *Contrast with Iram Sheikh v. Costco Wholesale Corp.*, No. CV-22-00947-PHX-DLR, 2024 U.S. Dist. LEXIS 20309, at *3 (D. Ariz. Feb. 6, 2024) (rejecting argument that surveillance camera footage was entitled to sealing because "Costco's primary use for its surveillance system is asset protection and theft deterrence" as "it is common knowledge that commercial retail businesses routinely use surveillance cameras to protect their wares and deter theft").  Further, Defendants have explained that the Customer Feedback Monitoring Procedures provide a step-by-step process of how to use Defendants' proprietary software tools, including how to determine if a review describes a safety issue. (Chiang Decl. ¶ 8.)  This appears to go beyond "did the product hurt the customer," but contains specific procedure for how to use proprietary software to determine if there is a safety issue.

Plaintiff also argues that a competitor will not be able to gain an advantage through disclosure of the Investigation Procedures because these policies do not include technical manuals or details of any particular investigation. (Pl.'s Opp'n at 7-8.)  Thus, Plaintiff contends a competitor will not be able to "reverse-engineer" these procedures for its own benefit.  Even without the proprietary software, however, the Investigation Procedures still reflect Defendants'

internal risk mitigation strategies and explains how it assesses safety complaints, including how to prioritize certain reports, when to escalate cases, and which teams are involved in that decision-making process.  (Chiang Decl. ¶ 7.)  Such information can still be used to Defendants' harm, even if a competitor could not necessarily re-create the proprietary software at issue.

Finally, Plaintiff complains that the CN Seller Identity Verification SOP is not confidential because it essentially "mirror[s] the requirements published on" public websites.  (Pl.'s Opp'n at 8.)  Having reviewed the CN Seller Identity Verification SOP, the Court finds that it goes far beyond what is available on public websites, as it "provides a step-by-step process" on how to use Defendants' software to verify sellers from China, Hong Kong, and Taiwan, including identifying potential issues.

Accordingly, the Court finds that Defendants have met their burden of demonstrating particularized harm as to the SOPs.

### ii.   Internal Spreadsheets

The Court finds Defendants have failed to establish that particularized harm will result from the public disclosure of the internal spreadsheets.

Defendants assert that the internal spreadsheets contain data extracted from Defendants' proprietary data management tools, such that disclosure could allow competitors to "reverse-engineer" these tools.  (Chiang Decl. ¶ 15.)  Having reviewed the internal spreadsheets, it is unclear how this would occur.  The categories of information appear to be generic; for example, the spreadsheet regarding customer complaints include the product number, brand name, customer information (which is redacted), the date and time of the return or complaint, and the alleged defect.  In contrast, in *Ashcraft v. Welk Resort Group, Corp.*, the logs and reports warranted a confidentiality designation because they contained "enough codes and other information about the architecture of Experian's proprietary matching system and credit procedures that a competitor could reverse-engineer the rules governing that system."  No. 216CV02978JADNJK, 2019 WL 12518367, at *2 (D. Nev. Sept. 26, 2019); *see also Cadence Design Sys., Inc. v. Pounce Consulting, Inc.*, No. 17CV04732PJHEDL, 2018 WL 10582121, at *1, 3 (N.D. Cal. May 7, 2018) (finding particularized harm from disclosure of a "phone home report" which contained 50

United States District Court
Northern District of California

categories of data regarding unauthorized use of the plaintiff's commercial software"). At the hearing, Defendants could not explain how reverse engineering could occur. Instead, Defendants focused on whether Plaintiff had a need for having the internal spreadsheets be public. Defendants, however, have the initial burden of establishing that particularized harm will result from public disclosure, regardless of Plaintiff's need. *See Foltz*, 331 F.3d at 1130. Defendants have not met that burden with a conclusory assertion that reverse engineering "could" occur.

Further, to the extent Defendants argue that the internal spreadsheets contain customer information that is entitled to protection, identifying information of the customers has already been redacted. Thus, it does not appear confidential customer information is at issue, even if their reviews (both public and hidden) are contained in the internal spreadsheets. At the hearing, Defendants argued that any information promulgated by a customer is customer information. The Court is not aware of any authority that suggests that all information promulgated by a customer is subject to confidentiality. Rather, courts have found that information such as "names, account numbers, IP addresses, email addresses, and/or customer activities on certain platforms" may be kept confidential "to protect the customers' privacy." *Activision Publ'g, Inc. v. EngineOwning UG*, No. CV 2:22-CV-00051-MWF (JCX), 2023 WL 2347134, at *1 (C.D. Cal. Feb. 27, 2023). Other courts have found that customer' private financial and personal information is entitled to confidentiality where it could harm a business's competitive standing or undermine trust. *See Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 6395513, at *2 (N.D. Cal. Feb. 4, 2020); *Kendon Indus. LLC v. Towblazer, Inc.*, No. 8:23-CV-00732-FWS-DFM, 2024 WL 5706154, at *3 (C.D. Cal. Nov. 18, 2024). Defendants, however, have not adequately explained why disclosure of the information at issue here -- which, again, is divorced from identifying information -- would affect customer privacy or Defendants' competitive standing.

Accordingly, the Court finds that Defendants have not met their burden of demonstrating particularized harm as to the internal spreadsheets.

### B.    Public and Private Interests

Next, the Court finds that the balance of public and private interests weigh in favor of retaining the confidentiality designations of the SOPs. "Where trade secrets or other confidential

7

commercial information is involved, the court will balance the risk of disclosure to competitors against the risk that a protective order will impair prosecution or defense of the claims." *RSI Corp. v. IBM*, No. 5:08-cv-3414 RMW, 2012 U.S. Dist. LEXIS 105982, at *3 (N.D. Cal. July 30, 2012). As discussed above, Defendants have identified the risk from disclosing the SOPs as competitors could use the information to undermine Defendants' ability to maintain a competitive advantage in risk and safety management, while bad actors could exploit perceived gaps in safety procedures. (*See* Chiang Decl. ¶ 15.) In contrast, Plaintiff identifies no effect of retaining the confidentiality designations on the prosecution of his case. Rather, Plaintiff only argues that there is a public interest in disclosure of the SOPs. (*See* Pl.'s Opp'n at 8-9.)

Ultimately, the instant case involves an injury to a single individual from using a ladder sold on Defendants' website. There is no particular public interest in this case. *Contrast with In re Roman Catholic Archbishop*, 661 F.3d at 428 (finding that the public had "a weighty interest in public safety and in knowing who might sexually abuse children," particularly as one of the priests was still working as a priest and could be brought into contact with children"). While Plaintiff argues that there have been other cases in which Defendants have been sued "for allowing third-party sellers to sell dangerous products to consumers," this does not mean there is a public interest in releasing the SOPs. (*See* Pl.'s Opp'n at 9.) It is unclear how the public would benefit from knowing how Defendants investigate safety issues or vet third-party sellers, particularly if disclosure may create its own increased fraud risks. *See Avaya*, 2020 U.S. Dist. LEXIS 241116, at *5 (finding no particular public interest in disclosing anticounterfeit measures). Further, to the extent Plaintiff argues that other potential plaintiffs who have been injured by goods sold on Defendants' website may "benefit" from disclosure of the SOPs, this is not a *public* interest; such individuals could obtain the SOPs through discovery should they file their own lawsuits. (*See id.*)

### C.    Attorney's Fees and Costs

Defendants request attorney's fees and costs, arguing that pursuant to the protective order, "[f]rivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging party to sanctions." (Stip. Protective Order § 6.3, Dkt. No. 39; *see* Defs.' Mot. re Confidentiality at 12.)

The Court denies Defendants' request.  As the Court has found that the internal spreadsheets are not entitled to confidentiality, the Court declines to find that Plaintiff's challenge was frivolous and/or made for an improper purpose.

### IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion to retain the confidentiality designation as to the SOPs, and DENIES Defendants' motion to retain the confidentiality designation as to the internal spreadsheets.  The Court also DENIES Defendants' request for attorney's fees and costs.

IT IS SO ORDERED.

Dated: February 23, 2026

_____
KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

9